IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 2018 Session

## MJM REAL ESTATE INVESTMENTS, LLC v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, ET AL.

Appeal from the Chancery Court for Davidson County
No. 16-645-I      Claudia C. Bonnyman, Chancellor

_____

No. M2017-01166-COA-R3-CV

_____

This appeal arises from a statutory writ of certiorari. The petitioner filed an application with the Metropolitan Historic Zoning Commission ("the Commission") to obtain a permit to renovate a 1935 industrial building in the Broadway Historic Preservation District in downtown Nashville. The Commission partially approved the application but required modifications before a permit would be issued. In pertinent part, the Commission denied the request to install vertically operable windows (similar to "roll up" garage doors) because they were not consistent with the style of the original 1935 windows. The Commission also required the construction of a parapet wall around the fifth story rooftop deck, rather than a railing proposed by the petitioner, to hide the building's rooftop additions because the additions were not compliant with the design guidelines for the district. Following an evidentiary hearing, the chancery court affirmed the Commission's decision. We affirm the chancery court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Kirk L. Clements, Nashville, Tennessee, for the appellant, MJM Real Estate Investments, LLC.

Jon Cooper, Director of Law; Lora Barkenbus Fox, and Catherine J. Pham, Nashville, Tennessee, for the appellees, Metropolitan Government of Nashville and Davidson County, Tennessee and the Metropolitan Historic Zoning Commission.

## OPINION

MJM Real Estate Investments, LLC ("Petitioner") seeks to renovate the building at 105 Broadway in downtown Nashville.[1] The subject property is located within the Broadway Historic Preservation District ("the District") where the Metropolitan Historic Zoning Commission ("the Commission") has jurisdiction "to insure the ongoing preservation of structures of historic value." M.C.L. § 17.36.100. Accordingly, the Commission must approve any changes made to the building through a permitting process. Tenn. Code Ann. § 13-7-407.

The building at 105 Broadway was constructed in 1935 as a four-story brick warehouse with steel Hopper windows, a common feature of industrial buildings during that time. Significant to this case, a Hopper window operates on a hinge which tilts the window out or in; thus the window remains completely visible when open. Also significant to this case, the 1935 building had a flat roof hidden behind a parapet wall.

Gaylord[2] purchased the property in 2000 and made substantial renovations to the exterior, leaving only the original brick, window openings, and parapet wall intact. Notably, Gaylord replaced the steel Hopper windows with modern industrial windows that did not open, and it added a partial fifth story rooftop deck and a partial sixth story,

---

[1] The building is adjacent to Acme Feed & Seed, a three-story building at 101 Broadway that

> has seen many changes since its first tenants in 1890. Among them included the Cummins brothers' grocery store…Southern Soda Works, Continental Baking Powder Co., Ford Flour Co., D. Byrd and Co., Bearden Buggy, Sherman Transfer Co., Chadwell Transfer and Storage Co., and Tennessee Wholesale Drug Co. Nashville businessman Currey L. Turner moved his feed store, Acme Feed and Hatchery, into the building in 1943 and changed the name to Acme Farm Supply in 1965. Acme was known for its promotions, including holding annual "Purina jamborees" featuring Purina pigs Ike and Mike, who were given away as door prizes. That promotion gave way to free "dog dipping" (treating a dog for fleas) on Saturdays….Acme also owned a famous pet calf named Beautena that…appear[ed] on stage at the Grand Ole Opry during commercials.

Acme Feed & Seed History, theacmenashville.com.

Acme Farm Supply closed its doors in 1999 and the building at 101 Broadway sat mostly vacant until 2014. *Id*. Since that time, it has housed a multi-story restaurant, bar, and entertainment venue under the name Acme Feed & Seed.

[2] The record does not provide the complete business name of the Gaylord entity that owned the building; nevertheless, the identity of that entity is not relevant to the issues on appeal.

which was an enclosed space called an "imaginarium."[3] All of the changes made by Gaylord occurred before the historic overlay went into effect.

The Broadway Historic Preservation District was created in 2007, at which time the Commission adopted the Broadway Historic Preservation District Design Guidelines ("the Design Guidelines"). The Design Guidelines provided that any further alterations to the buildings within the District should be in keeping with the original style of the building. Specifically, the Design Guidelines stated that rooftop additions could not exceed one story.

In February 2016, Petitioner applied for a preservation permit with the Commission, requesting permission to make significant changes to the building's windows and rooftop additions. In pertinent part, Petitioner sought permission to replace the windows on the first and second floors with vertically operable windows that are similar to "roll up" garage doors. Petitioner also sought permission to partially expand the fifth and sixth floors and to add railings that were similar to those installed by Gaylord in 2000. Petitioner also wanted to convert the "imaginarium" into a guitar-shaped bar area, which would connect to a seventh story deck that was to be added as well.

Petitioner's application for the permit was heard on March 16, 2016, and after considering the design plans, the Commission informed Petitioner that it would not permit the new windows to open vertically; however, it would approve NanaWall windows, which are folding windows that open horizontally. The Commission approved the expansion of the fifth and sixth floors as well as the addition of a seventh floor; however, it required Petitioner to replace a portion of the existing railing on the fifth floor with a parapet wall in order to hide the additional rooftop decks, which were not compliant with the Design Guidelines. The permit with the foregoing modifications was issued on June 10, 2016.

Soon thereafter, Petitioner filed a statutory writ of certiorari in the Chancery Court for Davidson County, arguing that the Commission's decision was arbitrary and capricious. First, Petitioner argued that its proposed railings on the fifth floor were consistent with Gaylord's original design, and it made no sense for the Commission to require Petitioner to replace part of the railing with a parapet wall. Second, Petitioner argued that because the Commission is only charged with regulating appearance and not function, the Commission did not have the authority to regulate how the windows opened. Alternatively, Petitioner contended that if the Commission had the authority to

_____

[3] The record does not define or describe the "imaginarium." From our review of the record, it appears to be a glass enclosed space on the roof where patrons may enjoy a beverage and view the stars. Wikipedia provides the following definition: "An imaginarium refers to a place devoted to the imagination. There are various types of imaginaria, centers largely devoted to stimulating and cultivating the imagination, towards scientific, artistic, commercial, recreational, or spiritual ends."

regulate how the windows opened, the building had minimal historical value due to Gaylord's substantial renovations in 2000. Thus, replacing the windows with non-historical windows would not affect the current historical value of the building.

At the hearing, the court heard testimony from Robert Steven Maxwell, the architect in charge of the renovation, and Sean Alexander, a historic preservationist with the Commission. After hearing the testimony and reviewing the evidence, the trial court affirmed the Commission's decision. Specifically, the court credited Mr. Alexander's testimony that the windows, when opened vertically, looked like a vacant hole in the wall, which significantly affected the appearance of the building. The court further ruled that

> there is an implicit grandfather provision in the [Historic Preservation] Guidelines and in the statutes which indicate that the property or preexisting condition of property in 2007 [when the historic district was created] may be preserved by the owner, but when alterations and additions and other changes, replacements, take place, then those alterations, replacements, and buildings must be in keeping with the 1935, that is the historic building….And the Court finds here that since [Petitioner] wants to alter its year 2000 windows that it used to replace the historic windows…it must now alter them in compliance with the historic guidelines. And [Petitioner] has not carried its burden to show that it is entitled to a Preservation Permit allowing those roll-up windows, because they are not historic.

As to the parapet wall, the court credited Mr. Alexander's testimony that the wall would hide the rooftop decks to make the building appear, from the street, as if it only had one rooftop addition, which would comply with the Design Guidelines.

Petitioner filed a motion to alter or amend, arguing that the trial court erred by affirming the Commission's decision. Additionally, Petitioner argued that Tenn. Code Ann. § 13-7-408 and M.C.L. § 17.40.420 mandated that the Commission issue a preservation permit within thirty days of its March 16 decision to approve the renovations with conditions. Since the Commission did not issue the permit until June 10, Petitioner asserted that it was entitled to unconditional approval of its February 29 application. The trial court denied Petitioner's motion, and Petitioner appealed.

## ISSUES

Petitioner presents nine issues for our review, which we have consolidated and rephrased as follows: (1) Did the Commission fail to timely issue a preservation permit in accordance with M.C.L. § 17.40.420 and Tenn. Code Ann. § 13-7-408; (2) Did the trial court err by affirming the Commission's decision to deny vertically operable windows;

- 4 -

and (3) Did the trial court err by affirming the Commission's decision to require Petitioner to replace a railing with a parapet wall?[4]

### STANDARD OF REVIEW

Tenn. Code Ann. § 13-7-409 states that "[a]nyone who may be aggrieved by any final order or judgment of the historic zoning commission…may have such order or judgment reviewed by the courts by the procedure of statutory certiorari." A chancery court's review under the statutory writ is by trial de novo. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990). Here, "de novo" means that the chancery court's review is not limited to the administrative record. *Tennessee Waste Movers, Inc. v. Loudon County*, 160 S.W.3d 517, 520 (Tenn. 2005). The chancery court holds a new hearing "based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue." *Id.* (quoting *Frye v. Memphis State Univ.*, 671 S.W.2d 467, 469 (Tenn. 1984)). If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692

---

[4] Petitioner stated the issues as follows:

1. Whether the Petitioner's application for a Preservation Permit should be approved *in toto* as the Commission failed to timely provide a response pursuant to Metro Ordinance 17.40.420 and Tenn. Code Ann. § 13-7-408.
2. Whether the trial court erred in construing Tenn. Code Ann. § 13-7-403 and the applicable guidelines to require Petitioner to conform 105 Broadway to the 1935 variation of the building as opposed to the 2000 variation.
3. Whether the trial court erred in finding that Tenn. Code Ann. § 13-7-401 *et seq* and the federal and local historic guidelines required that non-historical windows which had legally replaced historic windows in a previous renovation to maintain the historic features of the 1935 windows.
4. Whether the trial court erred in finding that the applicable historic guidelines contemplated maintaining historical features of windows when the historic windows no longer existed not because of deterioration, but because they had been legally replaced in a previous renovation with non-historical windows.
5. Whether the trial court erred in finding that the applicable historic guidelines regulated the function and appearance of windows.
6. Whether the trial court erred in finding that vertically operable windows were not historic because when the windows were open the historic frames were not visible and it appeared as if the window did not exist.
7. Whether the trial court erred in construing Broadway Historic Guidelines to prevent Petitioner from adding a 7th floor.
8. Whether the trial court erred in construing the Broadway Historic Guidelines to require a parapet wall to hide the sixth floor.
9. Whether the trial court erred in awarding the Commission discretionary costs.

(Tenn. 2014) (citing Tenn. R. App. P. 13(d)). Appellate courts review questions of law de novo with no presumption of correctness. *Id.*

## ANALYSIS

### I.   TIMELINESS OF THE PRESERVATION PERMIT

Petitioner argues that its February 29 application to the Commission should be unconditionally approved because the Commission did not issue a preservation permit within thirty days of its March 16 decision as required by law. The Metropolitan Government of Nashville and Davidson County ("Metro") argues that Petitioner and the Commission both agreed to delay the issuance of the permit until Petitioner submitted revised plans. Because the applicable ordinance permits a delay by mutual agreement, Metro argues that the Commission complied with the law.

Tenn. Code Ann. § 13-7-408 provides that the "historic zoning commission or the regional historic zoning commission shall, within (30) days *following the availability of sufficient data*, grant a certificate of appropriateness with or without attached conditions or deny the certificate, and shall state the grounds for denial in writing." (emphasis added). The applicable Metro ordinance provides:

> A. Consideration of Applications. The historic zoning commission shall meet within fifteen working days after receipt of an application for a preservation permit that includes sufficient data for review. Failure of the commission to act within thirty days after receipt of a sufficient application shall be deemed an approval *except when a mutual agreement has been made to extend the time limit*. The commission may conduct a public hearing prior to final action on any application.

M.C.L. § 17.40.420 (emphasis added).

At the March 16, 2016 hearing, the Commission approved Petitioner's February application for a preservation permit with several conditions, one of which required that "[u]nknown materials…be approved administratively prior to permitting." Thus, after the March 16 meeting, the Commission decided that it did not have sufficient data to issue a permit. Thereafter, Petitioner's architect, Patrick Bales, and Commission staff conferred over the next few weeks via email, and on June 7, Mr. Bales submitted the revised plans to the Commission staff. Three days later, on June 10, the Commission issued the preservation permit.

The minutes from the March 16 meeting and the subsequent communications and emails reveal that the permitting process was delayed because the Commission required additional data and revised plans before a decision could be made. Furthermore, the

- 6 -

record reveals that the Commission and Petitioner mutually agreed to the delay. Therefore, the Commission's failure to issue a permit within thirty days of the March 16 meeting will not constitute an implied approval of Petitioner's application as initially presented.

## II. PRESERVATION PERMIT

Petitioner argues that the trial court erred by affirming the Commission's decision to deny vertically operable windows and to require Petitioner to replace a railing with a parapet wall.

Tenn. Code Ann. § 13-7-402 empowers municipal governments "to establish special historic districts or zones, and to regulate the construction, repair, alteration, rehabilitation, relocation and demolition of any building" located within the designated historic zones or districts. Metro enacted separate historic zoning provisions in the Metropolitan Code of Laws "to insure the ongoing preservation of structures of historic value" to Nashville and Davidson County. M.C.L. § 17.36.100. Each historic district has a unique set of guidelines concerned primarily with regulating the exterior design elements of the buildings within the district to ensure architectural compatibility. M.C.L. § 17.36.100(B); M.C.L. § 17.36.110.

To promote compliance, Metro established a historic zoning commission (previously designated "the Commission") which is authorized to adopt a set of design guidelines appropriate for each district and has the power to apply those design guidelines when considering permit applications for new construction, alterations, or additions. M.C.L. § 17.40.400; M.C.L. § 17.40.410. The Commission adopted The Broadway Historic Preservation District Design Guidelines (previously designated "the Design Guidelines"), which apply to the buildings within the District.

When reviewing permit applications, the Commission must also consider:

(1) [The] [h]istoric or architectural value of the present structure;
(2) The relationship of the exterior architectural features of such structure to the rest of the structures, to the surrounding area, and to the character of the district;
(3) The general compatibility of exterior design, arrangement, texture, and materials proposed to be used; and
(4) Any other factor, including aesthetic, which is reasonably related to the purposes of this part.

Tenn. Code Ann. § 13-7-408.

## A. Vertically Operable Windows

Petitioner argues that by dictating how the windows functioned, rather than how they appeared, the Commission acted outside of its authority. Petitioner further argues that even if the court determines that the Commission acted within its authority, Tenn. Code Ann. § 13-7-408 requires the Commission to consider the historic value of the present structure when issuing permits. Petitioner contends that because Gaylord made substantial renovations in 2000, the present building has very little historic value. Therefore, Petitioner should not be required to replace the modern windows with historical windows.

We note that neither party disputes that the Commission lacks the authority to regulate how the windows function. However, the trial court credited Mr. Alexander's testimony that the vertically operable windows, when open, appear vacant. Thus, the trial court found, and we agree, that by prohibiting the vertically operable windows, the Commission acted within its authority to regulate the exterior appearance of the building.

The trial court further determined that once Petitioner decided to make alterations to the building, the Commission could require Petitioner to return to the 1935 style, rather than the style of the building as it was in 2007 when the overlay district was created. We agree with the trial court. Tenn. Code Ann. § 13-7-408 requires the Commission to consider four factors when reviewing permit applications, one of which is the "historic or architectural value of the present structure." The Commission must also consider the character of the surrounding structures and district, the general compatibility of the exterior design, and any other factor related to the purposes of historic zoning. *Id.*

Tenn. Code Ann. § 13-7-401 states that the purpose of historic zoning is to "preserve and protect historic structures, areas and districts which serve as visible reminders of the history and cultural heritage of this state…." Likewise, Metro's Code states that the purpose of the historic districts is to, *inter alia*, "preserve and protect the historical…value of buildings…[t]o regulate exterior design, arrangement, texture and materials proposed to be used within the historic districts to insure compatibility; [and] [t]o create an aesthetic appearance which complements historic buildings or other structures…." M.C.L. § 17.36.100.

The Design Guidelines provide that "[i]f replacement windows or window surrounds are necessary, replacements should replicate originals. ***If original windows do not exist, replacements should be appropriate for the building's style and period.***" (Emphasis added). Thus, the trial court correctly determined that the replacement windows must be compatible with the historical character of the building and the historical nature of the District.

The trial court found that the building, though modernized in 2000, was historic and contributed to the historic character of the District. The Design Guidelines define "historic" as "a structure or site, usually constructed by 1957 or earlier, which possesses historical or architectural significance based on the criteria for listing in the National Register of Historic Places." Mr. Alexander testified the building would meet the eligibility requirements for listing on the National Register for Historic Places. Thus, the trial court's finding was supported by the evidence.

Second, after the trial court determined that Petitioner's replacement windows should be consistent with the 1935 style, it found that the vertically operable windows proposed by Petitioner were not historical. Mr. Alexander testified that the original 1935 windows were "Hopper or awning functional windows." When the Hopper windows were opened, the smaller sections within the larger window tilted out or in. Mr. Alexander also noted that the vertically operable windows Petitioner proposed, when opened, "look like voids with no glass, no metal, no housing, no frames." According to Mr. Alexander, the vacant look is inappropriate for and inconsistent with a 1935 industrial-style building.

In place of vertically operable windows, the Commission approved NanaWalls, which, according to Mr. Alexander's testimony, open horizontally by folding. While NanaWalls do not replicate the original Hopper windows when opened, the trial court found that they would not appear vacant based on Mr. Alexander's testimony. Thus, the trial court determined that the NanaWall windows, approved by the Commission, were more in keeping with the 1935 design than the vertically operable windows.

Petitioner argues, however, that the Commission failed to consider that the building had retained very little of its original character after Gaylord renovated it in 2000. *See* Tenn. Code Ann. § 13-7-408 (When issuing permits, the Commission must consider the "[h]istoric or architectural value of the present structure.") We disagree. At the meeting on March 16, the Commission discussed the present non-historical features of the building, noting in the meeting minutes that "there are quite a number of alterations to the building already and there is a high degree of non-conformity." As a result, the Commission determined that "there should be some give-and-take as long as the outcome is more compliance." Accordingly, the Commission allowed Petitioner to replace several of the windows with a twenty-first century design, but denied the vertically operable windows to minimize the divergence from the historical style.

Thus, the evidence at the hearing and the administrative record support the trial court's determination that the Commission complied with the applicable statutes, ordinances, and design guidelines when it denied a permit for vertically operable windows.

## B. Parapet Wall

Petitioner concedes that the Design Guidelines only allow one rooftop addition and that its building had more than one rooftop addition. However, Petitioner argues that because the fifth and sixth story rooftop additions already existed, the seventh floor addition qualifies as the additional story. Petitioner further contends that even if the addition of the seventh floor is not in compliance with the Design Guidelines, a parapet wall would not hide the additional rooftop decks from the street view. Moreover, Petitioner contends that the Design Guidelines permit railings on rooftop additions and do not require parapet walls to hide them.

Section III.H.2 of the Design Guidelines provides:

Rooftop additions should not exceed one story (or 15') in height and should be set back a minimum of 30 feet from the main façade of the building and 20 feet from the secondary street if it is a corner building. Rooftop railings should set back from each street facing wall by 8'.… In locations where railings are visible from the street, the materials should minimize the impact of the railing.

When Petitioner submitted its February application for proposed renovations, the building at 105 Broadway was not compliant with the Design Guidelines because it had more than one rooftop addition—the partial fifth and sixth stories added by Gaylord in 2000. Petitioner's February proposal would have exacerbated the situation by adding yet another story—a seventh floor rooftop deck. Nevertheless, the Commission granted Petitioner's request to add a seventh story, while requiring the installation of a parapet wall in lieu of a railing around the fifth story addition to buffer the view of the additional floors.

The trial court found that though Petitioner's proposed rooftop renovations were not in compliance with the Design Guidelines, the parapet wall on the fifth story would make the building appear compliant from the street. Petitioner argues that the parapet wall would not hide the additional rooftop decks. However, the trial court credited Mr. Alexander's testimony that "in lieu of a…railing that advertises you have more than one story, the parapet looks like one story." Thus, the trial court's finding is supported by the evidence.

Petitioner argues that the Design Guidelines allow railings around rooftop decks and do not require parapet walls. While Petitioner's assertion is correct, the evidence shows that parapet walls are a common architectural feature in the District. Section III.D.2 of the Design Guidelines states that "[t]he roof forms of buildings within the district are typically flat or have a gentle slope behind a parapet wall." Mr. Alexander testified that "historically, [the building at 105 Broadway] would have a parapet that

extended a few feet essentially beyond the flat roof below…. Likewise, that is how historically many buildings were built…." Thus, the trial court affirmed the Commission's decision, based on its finding that the parapet wall would be more in keeping with the style of the original 1935 building and would harmonize the building with the rest of the District.

Considering the foregoing, we affirm the trial court.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against MJM Real Estate Investments, LLC.

_____
FRANK G. CLEMENT JR., P.J., M.S.